*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ANDREW MICHAEL ARTINIAN,

Defendant-Appellant.

UNPUBLISHED
September 10, 2019

No. 343983
Oakland Circuit Court
LC No. 2017-262500-FH

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

CELENE ANN ARTINIAN,

Defendant-Appellant.

No. 344332
Oakland Circuit Court
LC No. 2017-262497-FH

Before: BORRELLO, P.J., and K. F. KELLY and SERVITTO, JJ.

PER CURIAM.

Defendants, Andrew Michael Artinian (Andrew) and Celene Ann Artinian (Celene) but were tried jointly before separate juries. Andrew is Celene's son. Andrew was convicted of manufacturing 20 plants or more, but less than 200 plants, of marijuana, MCL 333.7401(2)(d)(*ii*), possession with the intent to deliver marijuana, MCL 333.7401(2)(d)(*iii*), and two counts of possession of a firearm in the commission of a felony related to the marijuana charges, MCL 750.227b. The trial court sentenced Andrew to 180 days' imprisonment for the marijuana convictions and two years' imprisonment for the felony-firearm convictions. Celene was convicted of manufacturing 20 plants or more, but less than 200 plants, of marijuana and maintaining a drug house, MCL 333.7405(1)(d). The trial court sentenced Celene to three years' probation. Finding no errors requiring reversal, we affirm.

# I. BASIC FACTS AND PROCEDURAL HISTORY

On December 4, 2016, the police were dispatched to Celene's home in response to a 911 call of a suspected drug overdose by Andrew. According to Officer Matthew Reed, upon arriving at the home, he smelled marijuana through the open door. Inside Andrew's bedroom, Officer Reed observed large amounts of cut marijuana hanging from wires from the ceiling for drying. Although Celene had given the police permission to enter her home, the police also obtained a search warrant.

A search of the home led to the discovery of additional marijuana strung from wall to wall inside Andrew's bedroom closet. The police recovered $7,800 (in $100 bills) and small plastic bags of seeds from a suit jacket pocket inside that closet. The police discovered 54 marijuana plants growing in another bedroom on the main floor. In the closet of that bedroom, the police observed several "clones," which are "clipped off leaves and pieces of marijuana plants that are put into these mini-greenhouses and given . . . root aid or another type of chemical to help it sprout a root to grow into a new marijuana plant." In an unfinished basement, which had a keypad lock on the door, a tarp separated the basement area into two rooms. One room, or section, had a "grow room" with grow lights over 36 potted plants of marijuana. Nearby were marijuana stalks that had already been harvested. The other room, or section, also had a "grow area" with a small grow tent, which contained nothing other than 24 more mature marijuana plants. In total, the police recovered 114 plants from the house, 20 of which were tested and confirmed to be marijuana. The police also discovered a digital scale and two glass jars containing suspected marijuana in Andrew's bedroom, and discovered another digital scale in the living room. Approximately 60 grams of marijuana wax were found in the refrigerator. A loaded nine-millimeter handgun was found on a nightstand in Andrew's bedroom.

At trial, Andrew testified that the marijuana in the home belonged to him, and he had been growing it there for about three years. He denied that Celene was involved with growing marijuana. Andrew and Celene both had medical marijuana cards. Andrew claimed that he would keep enough marijuana for use by himself and his mother, and he would sell the remainder to medical marijuana dispensaries. Andrew admitted owning a firearm, but said he kept it only for general home protection; he denied that it was connected to his marijuana operation.

Andrew's jury found him guilty of manufacturing 20 or more but less than 200 plants of marijuana, possession with intent to deliver marijuana, and two counts of felony-firearm. Celene's jury convicted her of manufacturing 20 or more but less than 200 plants of marijuana and maintaining a drug house, but acquitted her of possession with intent to deliver marijuana.

## II. DOCKET NO. 343983 - OV 14

Andrew's sole argument on appeal is that the trial court clearly erred by assessing 10 points for offense variable ("OV") 14 when scoring the sentencing guidelines. We disagree.

In *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013), our Supreme Court clarified both the quantum of evidence necessary to support a scoring decision and the standard of review to be used by this Court, stating:

-2-

Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence. Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo.

MCL 777.44(1)(a), which governs the scoring of OV 14, provides that a trial court is required to assess 10 points for OV 14 if "[t]he offender was a leader in a multiple offender situation." "The entire criminal transaction should be considered when scoring this variable." MCL 777.44(2)(a). In *People v Dickinson*, 321 Mich App 1, 22; 909 NW2d 24 (2017), this Court addressed the definition of a "leader" for purposes of scoring OV 14, observing:

> In *People v Rhodes* (*On Remand*), 305 Mich App 85, 90; 849 NW2d 417 (2014), we noted that the Legislature did not define what constitutes a "leader" for the purposes of OV 14. We therefore reviewed dictionary definitions and noted that "[t]o 'lead' is defined in relevant part as, in general, guiding, preceding, showing the way, directing, or conducting." *Id*. We concluded that for purposes of an OV 14 analysis, a trial court should consider whether the defendant acted first or gave directions "or was otherwise a primary causal or coordinating agent." See *id*.

Andrew's testimony alone established that he was the primary coordinating agent and clearly the leader in this enterprise. He testified that Celene had nothing to do with growing the marijuana; rather, he had been responsible for growing it for about three years. Andrew said he personally spent hundreds or even thousands of dollars each month to grow the marijuana, and Celene's primary contribution was supplying her home as the headquarters. In addition, Andrew was solely responsible for selling the marijuana to medical marijuana dispensaries.[1] Celene told the police that Andrew obtained the gun because of the large quantities of marijuana and cash they possessed. She claimed that aside from providing her home for the marijuana operation, she merely partook in using some of the marijuana and accepted some proceeds to pay the household bills. Celene was only charged and convicted under an aiding or abetting theory. Moreover, Celene's daughter testified that Andrew had control of the first floor of the home where the marijuana was discovered, and she claimed that only Andrew was involved with growing marijuana. Given that the evidence supported the conclusion that Andrew was the primary coordinating agent, the trial court did not clearly err by assessing 10 points for OV 14.

Moreover, even if OV 14 was improperly scored at 10 points, Andrew would not be entitled to resentencing. As Andrew concedes, the scoring of OV 14 does not affect his placement in OV Level II of the applicable sentencing grids for his two drug convictions. MCL

---

[1] On appeal, Andrew claims that Celene was the mastermind because of her role as his parent and homeowner, but this argument is directly contrary to his own trial testimony. Although Andrew also claims that Celene was more suited to leadership because he was hampered by a heroin addiction, Celene told the police that Andrew had not been using heroin because growing marijuana helped him avoid that addiction.

777.65; MCL 777.67. "Where a scoring error does not alter the appropriate guidelines range, resentencing is not required." *People v Francisco*, 474 Mich 82, 89 n 8; 711 NW2d 44 (2006).

## III.  DOCKET NO. 344332

## A.  SUFFICIENCY OF THE EVIDENCE

Celene argues that the evidence at trial was insufficient to support her convictions.[2] We disagree.  A challenge to the sufficiency of the evidence in a jury trial is reviewed de novo, by reviewing the evidence in the light most favorable to the prosecution to determine whether the trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt.  *People v Harverson*, 291 Mich App 171, 175; 804 NW2d 757 (2010).  "All conflicts with regard to the evidence must be resolved in favor of the prosecution."  *People v Wilkens*, 267 Mich App 728, 738; 705 NW2d 728 (2005).

## 1.  MANUFACTURE OF MARIJUANA

Celene first argues that there was insufficient evidence to support her conviction of manufacturing marijuana under MCL 333.7401(2)(d)(*ii*) as an aider or abettor.

The elements necessary to convict a defendant under an aiding and abetting theory are:

(1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement.  [*People v Plunkett*, 485 Mich 50, 61; 780 NW2d 280 (2010) (citations and quotation marks omitted).]

"An aider and abettor's state of mind may be inferred from all the facts and circumstances." *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999) (citation omitted).  Factors that

---

[2] Celene challenges the sufficiency of the evidence in support of her convictions in both a brief filed by appointed appellate counsel and in a pro se supplemental brief, filed pursuant to Supreme Court Administrative Order No. 2004-6, Standard 4 ("Standard 4 brief").  We note that Celene's Standard 4 brief does not contain any statement of questions presented, or separately list any specific legal issues.  The brief is written in a narrative style that mostly addresses various representations in the prosecutor's brief on appeal.  An appellant must identify the issues in a brief in a statement of questions presented.  MCR 7.212(C)(5).  This Court is not obligated to consider issues that are not properly raised and set forth in a statement of questions presented. *People v Brown*, 239 Mich App 735, 748; 610 NW2d 234 (2000).  Further, an appellant may not merely announce a position and leave it to this Court to discover and rationalize the basis for her claims.  *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998).  Despite the deficiencies in Celene's Standard 4 brief, we have attempted to address the substantive claims of error that are raised or argued in the brief.

may be considered include a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime. *Id*. at 757-758.

There was sufficient evidence presented at trial to establish that 20 or more but less than 200 plants of marijuana were manufactured by Andrew. In *People v Bosca*, 310 Mich App 1, 23; 871 NW2d 307 (2015), this Court explained that the "elements of manufacturing a controlled substance are: (1) the defendant manufactured a substance, (2) the substance manufactured was the controlled substance at issue, and (3) the defendant knowingly manufactured it." The manufacture of a controlled substance is defined as "the production, preparation, propagation, compounding, conversion, or processing of a controlled substance, directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis." MCL 333.7106(3).

Detective Nathan Eller testified that, during a search of defendants' home, he recovered 54 suspected marijuana plants in a bedroom and 60 suspected marijuana plants from the basement. According to both the lab report and Andrew's own admissions, at least the statutory minimum of 20 marijuana plants were growing in the home at the time of the search. Andrew admitted that he had been growing marijuana for about three years and spent significant amounts of money each month to support the grow operation. He explained that he grew the marijuana for both personal use and profit. From the manufactured marijuana, Andrew and Celene used what they needed, and then he sold the remainder to medical marijuana dispensaries.

In addition, evidence was presented at trial to establish that Celene performed acts or gave encouragement that assisted Andrew in the manufacture of the marijuana. Celene lived at the home with two of her adult children—Andrew and a daughter. She charged her daughter rent, but allowed Andrew to live in the home rent free. She also allowed Andrew to grow marijuana on the first floor and in the basement. She explained to the police that focusing on the grow operation had helped Andrew with his addiction to heroin. The jury could reasonably infer that Celene encouraged the operation and assisted Andrew by providing a rent-free space for him to manufacture the marijuana. Moreover, from her statement to Detective Eller that "[h]e has a firearm, because *we* have a lot of marijuana and money in the house" (emphasis added), the jury could infer that the marijuana operation was a joint enterprise.[3]

Finally, a reasonable trier of fact could conclude that Celene intended the commission of the crime or had knowledge that Andrew intended its commission at the time that she gave aid and encouragement. The record established that, as holders of medical marijuana cards, Celene and Andrew were each allowed to possess 2.5 ounces of marijuana, and Andrew was allowed to possess 24 marijuana plants. But the presence of much larger amounts of marijuana was evident to any observer. According to a responding officer, the strong smell of marijuana from inside the

---

[3] In her Standard 4 brief, Celene asserts that she did not use the phrase, "we have." But as discussed later, Celene did not offer evidence at trial to dispute Detective Eller's testimony. Also, Detective Eller testified that he "quoted" Celene's statements in his report, which he referenced during his testimony.

home permeated outdoors. The police recovered 114 suspected marijuana plants from the home, along with other seeds, marijuana wax, cut marijuana, jars of suspected marijuana, clones, and stalks. According to testimony from Celene's daughter, Celene lived on the second floor, but had access to the first floor, where the family shared use of the kitchen, and also had access to the basement containing the plants. When Detective Eller told Celene that he would be seizing the marijuana in the house, she replied, "So are you going to take all of the marijuana or just leave us what we're allowed to have?" From Celene's statement and the fact that she lived in the home containing the marijuana, the jury could infer that she knew that Andrew was manufacturing 20 or more but less than 200 plants of marijuana. From this same evidence, the jury could also infer that Celene knew that they had more than the amounts allowed with their medical marijuana cards. In addition, after Detective Eller clarified that he was taking all of the marijuana, Celene then said, "Wait, no. You can't take all of it, how are we going to pay our bills[?]" From this statement, the jury could infer that Celene intended the commission of the crime because of the financial benefits she reaped. While Celene argues that there was no physical evidence tying her to the grow operation or its profits, circumstantial evidence and reasonable inferences arising from the evidence may be sufficient to prove the elements of a crime. *People v Lugo*, 214 Mich App 699, 710; 542 NW2d 921 (1995).

In sum, there was sufficient evidence to enable the jury to find beyond a reasonable doubt that Celene aided or abetted the manufacture of 20 or more but less than 200 plants of marijuana.

## 2. MAINTAINING A DRUG HOUSE

Celene next argues that there was insufficient evidence to support her conviction of maintaining a drug house. We disagree.

MCL 333.7405(1)(d) provides that a person shall not:

Knowingly keep or maintain a store, shop, warehouse, dwelling, building, vehicle, boat, aircraft, or other structure or place that is frequented by persons using controlled substances in violation of this article for the purpose of using controlled substances or that is used for keeping or selling controlled substances in violation of this article.

"The phrase 'keep or maintain' implies usage with some degree of continuity that can be deduced by actual observation of repeated acts or circumstantial evidence . . . that conduces to the same conclusion." *People v Thompson*, 477 Mich 146, 155; 730 NW2d 708 (2007). "[A] person may be deemed to keep and maintain a drug house if that person has the ability to exercise control or management over the house." *People v Bartlett*, 231 Mich App 139, 152; 585 NW2d 341 (1998).

Evidence was presented that Celene owned the home where the marijuana was discovered. She lived in the home with her two children. Celene demonstrated her ability to control or manage the home by charging her daughter rent, but declining to charge Andrew rent in lieu of assistance with the electric bill. There was no dispute at trial that Andrew had been growing marijuana in the home for years. As addressed earlier in this opinion, given the seeds, marijuana wax, cut marijuana, jars of suspected marijuana, clones, stalks, and especially the 114

suspected marijuana plants—which far exceeded any amount allowed by defendants as medical marijuana cardholders—the jury could conclude that the home was used for illegally keeping controlled substances. And again, in light of Celene's statements about the amount they were allowed to keep and questioning how they would pay their bills if the marijuana was seized, the jury could infer that Celene knew that the home was being used to illegally maintain the marijuana. Accordingly, there was sufficient evidence to support Celene's conviction of maintaining a drug house.

In both her brief on appeal and her Standard 4 brief, Celene suggests that there was insufficient evidence to support her convictions because she and Andrew did not know the amount of marijuana in the home was illegal, particularly in light of their medical marijuana cards. But as plaintiff argues, "ignorance of the law or a mistake of law is no defense to a criminal prosecution." *People v Motor City Hosp & Surgical Supply, Inc*, 227 Mich App 209, 215; 575 NW2d 95 (1997).

In her Standard 4 brief, Celene cites numerous facts and exhibits, such as the police report, which are not part of the trial court record. She claims that she would have presented some of these facts through her own testimony, but because the judge excluded any medical marijuana defense and evidence about the caregiver relationship, she was precluded from testifying. First, "a party may not expand the record on appeal." *Detroit Leasing Co v City of Detroit*, 269 Mich App 233, 237; 713 NW2d 269 (2005).

Second, "[a] defendant's right to testify in his own defense stems from the Fifth, Sixth, and Fourteenth amendments of the United States Constitution." *People v Boyd*, 470 Mich 363, 373; 682 NW2d 459 (2004). The Michigan Constitution also provides a defendant with the right to testify during trial. Const 1963, art 1, §§ 17, 20. "Although counsel must advise a defendant of this right, the ultimate decision whether to testify at trial remains with the defendant." *People v Bonilla-Machado*, 489 Mich 412, 419; 803 NW2d 217 (2011). If a defendant "decides not to testify or acquiesces in his attorney's decision that he not testify, the right will be deemed waived." *People v Simmons*, 140 Mich App 681, 685; 364 NW2d 783 (1985) (quotation marks and citation omitted).

Celene waived the right to testify on the record at trial. She stated that she had consulted with her attorney about the decision over the course of several months, "several times over multiple days." Celene further stated that she had given the decision a lot of consideration, she had discussed the pros and cons of testifying with her attorney, and she had had enough time to make her choice. Celene also stated that she was not threatened or promised anything to not testify. Finally, Celene testified that she was satisfied with her attorney's advice and representation. As a result of Celene's waiver of the right to testify, she also waived the right to personally present evidence to the jury through her testimony. The jury, not this Court, is the trier of fact. *People v Blevins*, 314 Mich App 339, 357; 886 NW2d 456 (2016). Therefore, we will not consider any testimonial statements from Celene that are not part of the record.

## B. ADDITIONAL ISSUES IN CELENE'S STANDARD 4 BRIEF

### 1. RIGHT TO PRESENT A DEFENSE

Celene argues in her Standard 4 brief on appeal that she was precluded from presenting evidence related to the Michigan Medical Marihuana Act ("MMMA"), MCL 333.26421 *et seq.*, specifically Andrew's status as her caregiver. We disagree.

We review de novo whether a defendant was denied her constitutional right to present a defense. *People v Kurr*, 253 Mich App 317, 327; 654 NW2d 651 (2002). "A constitutional error is harmless if '[it is] clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.' " *People v Shepherd*, 472 Mich 343, 347; 697 NW2d 144 (2005) (citation omitted).

"A trial court's evidentiary decisions are reviewed for an abuse of discretion." *People v Yost*, 278 Mich App 341, 353; 749 NW2d 753 (2008). "A trial court abuses its discretion when it selects an outcome that does not fall within the range of reasonable and principled outcomes." *Id*.

> A defendant has a constitutionally guaranteed right to present a defense, which includes the right to call witnesses. But this right is not absolute: the "accused must still comply with 'established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.' " Nevertheless, the sanction of preclusion is extreme and should be limited to only the most egregious cases. [*Id.* at 379 (citations omitted).]

A defendant may claim immunity under § 4 of the MMMA if the defendant proves by a preponderance of the evidence that, at the time of the charged offense, the defendant

> (1) was issued and possessed a valid registry identification card,
>
> (2) complied with the requisite volume limitations of § 4(a) and § 4(b),
>
> (3) stored any marijuana plants in an enclosed, locked facility, and
>
> (4) was engaged in the medical use of marijuana. [*People v Hartwick*, 498 Mich 192, 217-218; 870 NW2d 37 (2015), citing MCL 333.26424(a) and (b).]

Section 8 of the MMMA applies to "patients" more generally, provides an affirmative defense to charges involving marijuana for its medical use, and states in relevant part:

> (a) Except as provided in [MCL 333.26427], a patient and a patient's primary caregiver, if any, may assert the medical purpose for using marihuana as a defense to any prosecution involving marihuana, and this defense shall be presumed valid where the evidence shows that:
>
> (1) A physician has stated that, in the physician's professional opinion, after having completed a full assessment of the patient's medical history and current medical condition made in the course of a bona fide physician-patient relationship, the patient is likely to receive therapeutic or palliative benefit from the medical use of marihuana to treat or alleviate the patient's serious or

-8-

debilitating medical condition or symptoms of the patient's serious or debilitating medical condition;

(2) The patient and the patient's primary caregiver, if any, were collectively in possession of a quantity of marihuana that was not more than was reasonably necessary to ensure the uninterrupted availability of marihuana for the purpose of treating or alleviating the patient's serious or debilitating medical condition or symptoms of the patient's serious or debilitating medical condition; and

(3) The patient and the patient's primary caregiver, if any, were engaged in the acquisition, possession, cultivation, manufacture, use, delivery, transfer, or transportation of marihuana or paraphernalia relating to the use of marihuana to treat or alleviate the patient's serious or debilitating medical condition or symptoms of the patient's serious or debilitating medical condition.

(b) A person may assert the medical purpose for using marihuana in a motion to dismiss, and the charges shall be dismissed following an evidentiary hearing where the person shows the elements listed in subsection (a).

(c) If a patient or a patient's primary caregiver demonstrates the patient's medical purpose for using marihuana pursuant to this section, the patient and the patient's primary caregiver shall not be subject to the following for the patient's medical use of marihuana:

(1) disciplinary action by a business or occupational or professional licensing board or bureau; or

(2) forfeiture of any interest in or right to property. [MCL 333.26428.]

In *People v Manuel*, 319 Mich App 291, 299; 901 NW2d 118 (2017), this Court explained:

Whether a defendant is entitled to immunity under § 4 is a question of law that a trial court must determine before trial. *People v Hartwick*, 498 Mich 192, 212-213; 870 NW2d 37 (2015). To determine whether a defendant is entitled to § 4 immunity, a trial court "must make factual determinations, including whether the defendant has a valid registry identification card and whether he or she complied with the volume, storage, and medical use limitations." *Id*. at 213-214.

Similarly, "the § 8 defense cannot be asserted for the first time at trial, but must be raised in a pretrial motion for an evidentiary hearing." *People v Kolanek*, 491 Mich 382, 411; 817 NW2d 528 (2012).

In this case, only Andrew raised a § 8 defense before trial. But because his motion was not timely filed and heard, the trial court denied it and precluded any introduction of evidence related to the affirmative defense in Andrew's case. Celene did not file any pretrial motions related to § 4 or § 8 of the MMMA, and the trial court similarly precluded introduction of related

evidence citing her failure to file a motion in limine.[4] In light of *Kolanek* and *Manuel* that these are matters that may not be asserted for the first time at trial, the trial court did not abuse its discretion by precluding evidence related to the MMMA affirmative defense or immunity at trial. Permitting this last-minute evidence at trial that defendants were allowed to possess a certain number of plants could have prejudiced the prosecution because only 20 suspected marijuana plants—the minimum number required to establish a violation of MCL 333.7401(2)(d)(*ii*)—had been tested to confirm that they were marijuana. Celene therefore cannot establish a violation of her right to present a defense because that right must yield to rules of criminal procedure intended to maintain fairness. *Yost*, 278 Mich App at 379.

In any event, even if Celene could establish that the trial court erred by precluding evidence related to the MMMA affirmative defense and immunity, any error was harmless beyond a reasonable doubt. After the trial court initially ruled that evidence related to the MMMA affirmative defense and immunity would be precluded in Celene's case, the court ruled that the prosecutor had opened the door to this evidence during Detective Eller's testimony. Afterward, Celene was allowed to elicit evidence related to defendants' medical marijuana caregiver and patient cards, the quantities of marijuana that defendants were allowed to possess with the cards, and Celene's attorney argued in closing argument that Celene did not think she was committing a crime because of the MMMA. Although Celene claims that she was precluded from using the term "caregiver" in her defense, her claim is inconsistent with the record. Any further testimony regarding Andrew's caregiver status would have been cumulative.

## 2. JOINT TRIAL

Celene argues that she and Andrew should have been tried separately because Andrew was precluded from asserting an affirmative defense under the MMMA. Because Celene did not move to sever her trial from Andrew's, this claim is unpreserved. We review this unpreserved severance argument for plain error affecting Celene's substantial rights. *Carines*, 460 Mich at 763-764.

"There is a strong policy favoring joint trials in the interest of justice, judicial economy, and administration, and a defendant does not have an absolute right to a separate trial." *People v Etheridge*, 196 Mich App 43, 52; 492 NW2d 490 (1992). A trial court must sever the trial of codefendants on related offenses only when the defendant shows that "severance is necessary to avoid prejudice to substantial rights of the defendant." MCR 6.121(C); *Etheridge*, 196 Mich App at 53. To show that severance is necessary, a defendant must provide the court with a supporting affidavit, or make an offer of proof, "that clearly, affirmatively, and fully demonstrates that his substantial rights will be prejudiced and that severance is the necessary

---

[4] Celene incorrectly suggests that she had no duty or ability to file a pretrial motion because she was a patient and Andrew's motion "applied only to caregivers and had nothing to do with me because I was a patient." Section 4 "immunizes registered qualifying *patients*," *Ter Beek v City of Wyoming*, 495 Mich 1, 5; 846 NW2d 531 (2014) (emphasis added), and the plain language of § 8 allows "a *patient* and a patient's primary caregiver . . . [to] assert the medical purpose for using marihuana as a defense." MCL 333.26428(a).

means of rectifying the potential prejudice." *People v Hana*, 447 Mich 325, 346; 524 NW2d 682 (1994); see also MCR 6.121(C). Such a showing is not made by codefendants' plans to present inconsistent defenses. *Hana*, 447 Mich at 349. The Supreme Court in *Hana* explained:

> It is natural that defendants accused of the same crime and tried together will attempt to escape conviction by pointing the finger at each other. Whenever this occurs the co-defendants are, to some extent, forced to defend against their co-defendant as well as the government. This situation results in the sort of compelling prejudice requiring reversal, however, only when the competing defenses are so antagonistic at their cores that both cannot be believed. Consequently, we hold that a defendant seeking severance based on antagonistic defenses must demonstrate that his or her defense is so antagonistic to the co-defendants that the defenses are mutually exclusive. Moreover, defenses are mutually exclusive within the meaning of this rule if the jury, in order to believe the core of the evidence offered on behalf of one defendant, must disbelieve the core of the evidence offered on behalf of the co-defendant. [*Id.* at 349-350, quoting *State v Kinkade*, 140 Ariz 91, 93; 680 P2d 801 (1984).]

"The use of separate juries is a partial form of severance to be evaluated under the standard, set forth above, applicable to motions for separate trials." *Id*. at 331.

As discussed earlier, Andrew was precluded from asserting a § 8 affirmative defense, but contrary to Celene's argument in her Standard 4 brief, her status as a "patient" did not prevent her from filing a timely pretrial motion asserting the same defense or immunity under § 4. Celene filed no such motion, but was nevertheless allowed to introduce evidence of defendants' medical marijuana cards and the quantities of marijuana that they could possess. The fact that Andrew's motion was denied had no bearing on Celene's case.

Moreover, nothing in the record demonstrates the prejudice required by MCR 6.121(C). Andrew's defense was that he thought his sale of marijuana to medical marijuana dispensaries was legal. Moreover, he maintained that Celene had nothing to do with the growth of the marijuana. Celene offered a mere presence defense and similarly argued that she had nothing to do with the growth of the marijuana. Moreover, she maintained that the growth and possession of marijuana in the home fell under the MMMA, and the sale of medical marijuana to the dispensaries was legal. These defenses were complimentary, and not so antagonistic that they could not both be believed. *Hana*, 447 Mich at 349-350. In addition, the court employed the added safeguard of separate juries. Therefore, Celene cannot establish a plain error affecting her substantial rights from the court's failure to sua sponte sever the trials.

Affirmed.

/s/ Stephen L. Borrello
/s/ Kirsten Frank Kelly
/s/ Deborah A. Servitto